[No. 1954].

SHAW v. LOCKETT (JEWELL SUBSTITUTED) TREASURER, ET AL.

1. SCHOOL DISTRICTS—LIMITATIONS—PLEADING AND PROOF.
Where the legality of the organization of a school district is questioned, and it is attempted to be sustained by the statute of limitation (section 3038, General Statutes, 1883), and the application of the statute is dependent on matters *dehors* the record, the statute must not only be pleaded, but the pleader must produce proof of the facts which make it applicable.

2. SCHOOL DISTRICTS—TAXES.
Where the levy of a tax by a school district under section 3058, General Statutes, 1883, is assailed, to sustain the tax it must affirmatively appear that in making the levy the organization proceeded in accordance with the statute and kept within its limit, and that the levy was for the purposes and uses authorized by the statute.

3. SCHOOL DISTRICTS—TAXES—PROPERTY SUBJECT TO SALE.
Property located in a school district is alone subject to sale for taxes levied on the property of the district, and where a tract of land lies partly within and partly without the boundaries of a school district, that part lying without cannot be sold for taxes levied upon that part within the district.

4. Same.

Where a school district tax is levied on personal property belonging to one person and situated on land belonging to another, the land cannot be sold for the taxes.

*Appeal from the District Court of Saguache County.*

Mr. Charles A. Merriman and Messrs. Wolcott & Vaile, for appellant.

Mr. Wm. W. Field, of counsel.

Mr. John W. Davidson, for appellees.

Bissell, P. J.

This was originally a suit in equity against Lockett, the treasurer of Saguache county, to restrain the collection of sundry taxes alleged to have been illegally levied by school district No. 29 on the southeast section of Baca grant in Saguache county. Since the case was brought here, there has been a change in the officials of the county, and Jewell, the present treasurer, has been substituted for Lockett. There is another defendant, to wit, the school district No. 29, which is assumed to be a corporation regularly organized under the statute possessing the functions of a school organization. While the suit was pending, the treasurer made application to bring in the school district, that it might defend and establish its legality and the consequent legality of the taxes. No opposition was made to the order, the school district came in and filed its answer, and became the principal contestant. The suit as first begun concerned the taxes of 1894 and 1895, but by supplemental complaint the taxes of 1896 and 1897 were included, and the taxes of all four years are therefore under consideration. The cause was advanced because the taxes have not been paid, and the district is levying other taxes for subsequent years and attempting to collect them. The complainant, Shaw, insists the school district was never le-

gally organized, and was without power to levy the taxes and never had authority to impose taxes on Baca grant. We do not intend to dispose of this proposition. There are several reasons which lead us to this conclusion. The principal one is that there is not enough in the record to enable us adequately to judge about it, and one of the defenses, if well sustained by competent proof, might preclude any consideration of the proposition. What we shall say about it is not for the purpose of determining it, but to illustrate the condition and show the necessity of sufficient proof of facts necessary to support the plea of what might be called the statute of limitations. It is also referred to to dispose of any contention respecting the inequitable character of the result, and to demonstrate as far as may be that the appellant has a right, even as against the county, or the district, to insist on the strict establishment of his legal rights, whatever may be the consequences, either as to those *quasi* corporations, or as to the holders of any school warrants which may have been issued. It is also stated to show that it is possible the residents of this school district may have imagined they were proceeding lawfully, and were entitled to establish a school district when and as they did. The case presents some very hard features as to both litigants. It must necessarily entail misfortune to somebody, but we see no possible basis on which we can reach a conclusion which shall be equitable as to both parties, or any conclusion which will not inevitably work out apparently harsh results, either as to the school district or the county, and certainly as to the holders of warrants which may have been issued for the support of the school. With this premise we proceed :

Baca grant No. 4 comprises a very large territory in Saguache county. It is upwards of twelve and a half miles square and includes more than 90,000 acres. For many years the validity of the grant was in dispute and the title which Shaw had and now holds, was not established until the decision of *Shaw v. Kellogg*, 170 U. S. 312. By that adjudication the title was quieted and Shaw's rights

fully adjudicated. There were some other suits brought
against one or more of the organizers of this district. Judg-
ments were rendered in the United States circuit court at
Denver, and possibly in some of the local tribunals in Sa-
guache county. Suffice it to say, the various judgments set-
tled Shaw's title. It must now be assumed that from a time
prior to the organization of school district No. 29 to the pres-
ent, Baca grant No. 4 was private property owned by an in-
dividual, largely if not wholly enclosed by a fence, and that
therein and thereon neither squatters nor trespassers could
acquire title as against the real owner, except by an undis-
puted adverse possession sufficient under the statute of lim-
itations. It therefore follows, the territory sought to be in-
cluded in district No. 29 was private property on which the
organizers had no rights, and with respect to which they were
without legal authority to proceed in the organization of a
school district. This, of course, is subject to a limitation
which will be subsequently referred to. On the other hand,
it appears to be true, Duncan and sundry other people had
settled on a portion of Baca grant No. 4, assuming the land
on which they settled was government land and open to pub-
lic settlement. Thereon a little town called "Duncan" was
built up, and about the property settled on by Duncan and
in this little village there had clustered a number of settlers
who were seeking to establish homes, and possibly mine in
the neighboring hills which were supposed to contain mineral
wealth. They were there for many years, the settlement
running back to 1878, and possibly earlier, and they were
there claiming the right to occupy and enjoy and insisting
Baca grant was without validity. Their possessions, so far
as we can see, never ripened by adverse occupancy into a
title, and when Shaw's title was ultimately adjudicated by
the supreme court of the United States, these persons thus
living on the grant were trespassers and without legal rights
of settlement. This statement illustrates the very harsh and
difficult character of the questions presented and of the judg-
ment which must be entered. In 1893, Duncan and his neigh-

bors attempted to organize a new school district out of a portion of two others theretofore organized school districts, making the new one No. 29.   Proceeding under the statute these parties presented a petition to the county superintendent and then posted a notice advising the community of the intention to establish the new school district within certain defined boundaries.   According to the petition the boundaries of the district were wholly within the limits of the Baca grant.   As established this does not seem to be true, and where the discrepancy occurs we are not able to determine, nor do we feel called on to decide it since the court made no finding about it.   At all events, the district as apparently established by the order of the county superintendent included outside territory which was probably barren, mountainous and wholly without inhabitants, except as to one family without children living quite a distance from the schoolhouse.   Disregarding and making no determination as to the effect of the inclusion by the county superintendent of territory other than that petitioned for, we now state that in 1893 the inhabitants of the little town of Duncan got together to organize this school district.   We do not determine what they did, nor the legal effect of it other than to say it would substantially appear the voters got together and voted to establish the district. Whether the vote established the district according to the original petition, or according to the boundaries assumed by the county superintendent, we neither inquire nor determine. The case must go back for a hearing and a determination of many questions, and the parties must make proof and the court must find what the facts are in regard to many of those matters.   In the present state of the record, and in the absence of findings, we ought not to review the evidence and for ourselves conclude what it discloses.   Under other circumstances we might feel it our duty to proceed, but the inadequacy of the testimony is enough to relieve us of either the duty or the responsibility.   After the proceedings already suggested the district had a meeting on the 7th of May, 1894. It was called at the post office, and thereat, as appears from

the records, sundry residents were present. They elected a president and a secretary and treasurer. Then the record continues: "Motion to vote a fifteen-mill tax carried. Motion to adjourn carried." On May 6, 1895, there was another meeting called to order by the apparent president with officers and people living in the district present, and it was then "moved we vote a tax of eleven mills. Carried." In 1896 on the 4th of May, there was the same action except that there was a motion to vote a ten-mill tax. In 1897 another meeting was held when it was moved and seconded that they levy a five-mill tax. No other evidence of action or attempted action by the members of the district is exhibited by the record. We are wholly unadvised by what they did, or by any record which they made as to the purpose for which the tax was levied, as to the amount of taxable property in the district, or as to the necessity for the revenue which that tax would produce, or whether it was to be used for the legitimate purposes of a school district. It is quite true the plaintiff introduced an exhibit which would somewhat supplement the defendant's proof tending to show that for the years 1894, 1895, 1896 and 1897, $1,395.17 was expended for the benefit of school district No. 29 from the special tax fund, but in these items there was some $492.32 disbursed for "appliancs" of which $249.67 was for an organ and freight. We are unadvised as to the assessed value of the property within the limits of the district, and as to the probable revenue which that sort of a tax would raise, or whether the revenue which it would raise would be within or largely without the necessities of the school district and its legitimate expenditures. We suggest this because we think these should be matters of proof and thereon the court should make a finding. It is possible that on the basis of the assessed value of property within the limits of the district and the tax ordered, the resulting revenue might not be beyond the actual and legitimate expenses of operation. We might then hold the taxpayer was not aggrieved and was disentitled to the equitable remedy of injunction to restrain the collection of the taxes,

notwithstanding the apparent irregularity in the vote to make the levy. We do not pass on this question, but simply leave it with these suggestions for the ultimate guidance of the court.

The district pleaded a statute of the state, General Statutes 1883, section 3038, which provides that any school district then existing, or which may afterwards be formed, which shall exercise the undisputed prerogatives and enjoy the privileges of a legally organized district for a year shall be deemed to have been legally established. This is a wholesome and a legitimate statute of limitations entirely within the power of the legislature, and if a school district brings itself within its terms, its organization cannot be questioned. We suggest this because it will be evident to the profession that there must generally be great difficulty to prove the actual legality of a school district organized to embrace property entirely owned by others, although the organizers may live within its limits. If the principle is once definitely established that trespassers and squatters on private property may organize school districts within the boundaries of private ownership and levy taxes at their pleasure for the support and maintenance of schools it would be a very adroit and a very successful and satisfactory way of confiscating your neighbor's property for your own benefit. Ordinarily this could never be done because the parties would be restrained by suit or by legitimate and successful notice inhibiting them from proceeding in that manner and if their right to thus organize and establish and maintain a school on private property and tax the owner for its maintenance was disputed, the statute would be inoperative. In the present case there was great excuse for the procedure and the parties probably proceeded on the assumption that they were settlers on government land and had a right to locate there, and had a right to establish the school district and levy taxes to support it. The ultimate adjudication disposes of the contention. The facts tend to justify the procedure and take away from what was done what would otherwise furnish a basis

for criticism and condemnation. We only make the suggestion that it may not be assumed that we hold parties can thus, if their proceeding is disputed, acquire such rights. In the present case the school district pleaded this statute. Had they offered adequate proof about it we would have been compelled to determine the legality of the organization of school district No. 29. When the application of the statute is dependent on matters *dehors* the record it must not only be pleaded, but the pleader must produce proof of the facts which permit or compel its application. This burden was neither assumed nor discharged and the record is not clear to the point. There was some evidence offered to the effect that notice of the title and claim of the grant owners was given by publication and posting, but to what extent this was done, or to whom the notice was given, whether the residents had knowledge of it or the organizers of the district itself as a school district had notice, does not appear. We therefore prefer to make these suggestions, leaving the court on the subsequent trial to investigate it, and to find the facts when we may be able to apply the law. Under these suggestions the trial court may be able to determine whether the statute is in reality applicable and therefore a bar to any attack on the legality of the district.

We now come to the question on which alone the case will be made to turn. This is the insufficiency of the proof respecting the levy of the tax according to the provisions of the statute. General Statutes, 1883, section 3058. Thereby it is substantially provided that the qualified electors of a school district, when assembled at a regular meeting, have certain specified powers; they may appoint a chairman and other officers, adjourn from time to time, fix a site for a schoolhouse, order such tax on taxable property of the district as the meeting shall deem sufficient for any of the following purposes : to pay teachers, to purchase or lease a suitable site for a schoolhouse or schoolhouses, to build, rent or purchase a schoolhouse or schoolhouses and to keep in repair and furnish the same with the necessary fuel and

appendages, to procure libraries for the schools, books and
stationery for the use of the board and district meetings, and to
defray all other contingent expenses of the district, and to
transact generally such business as may tend to promote the
cause of education.    This is the sole power conferred on
school districts for the purposes of taxation.    It is quite evi-
dent without argument, and no authority need be cited to
the proposition, the power of taxation is a part of the gov-
ernmental authority, and when it is conferred on a subordi-
nate organization which in reality is no part or parcel of
either the legislative or judicial departments of the state, or
of the county, this power must be exercised as conferred
and in conformity to the statute, and whenever the proceed-
ings are attacked it must appear the organization kept within
its limits and that what was done was done in accordance
with it, and that the taxes which they assumed to levy were
levied for the purposes and for the uses which the statute
permits.    Were this general principle not true, irresponsible
organizers of school districts, even though they might have
children, would have authority to levy unusual, extraordi-
nary and oppressive taxes on property holders.    As will be
observed from the statement already made, we are wholly
unable to determine the purpose for which the taxes were
levied, the uses to which the money was to be put, what ex-
penditures were in point of fact made, and whether they
were made for legitimate, statutory objects, except as was
shown by one of the plaintiff's exhibits which does not cover
the entire case.    As the record now is, we must conclude
the school district was without authority to levy the various
taxes of fifteen, eleven, ten and five mills, unless the levy
was for the statutory uses and purposes.    We do not intend to
decide that if the proof shall show the amount of assessable
or taxable property within the limits of the district, and that
the revenues which would result from the imposition of that
tax, would produce a fund substantially sufficient and only
substantially sufficient to meet the statutory requirements,
and it should further appear that the district did expend for

legitimate, necessary and statutory purposes the amount of money which would be produced by the levy or substantially that amount, the action would not be sustainable. We do not hold that it is open to the taxpayer to question the regularity of the record or the regularity of the proceedings of the board, if it should be the fact that nothing has been done but what might be lawfully performed. We leave this question open, neither believing that we have the right nor that the duty rests on us to determine this question in advance of an adequate showing. We prefer to leave it entirely open for subsequent adjudication and permit the parties to produce what proof they can on the subject and when the lower court shall have made findings of fact on this proposition we can in the light of the facts determine whether the doctrine is applicable, and whether the case is one which permits us to so hold.

In the ultimate judgment the court held the taxes of 1894 invalid, and those of 1895, 1896 and 1897 regular, and dissolved the injunction as to the collection of those later taxes. We are wholly unable to apprehend the reasons which induced the court to adjudge the taxes of 1894 invalid, and the taxes of the other three years entirely regular, the same reasons apparently existing to the three as to the one, and since the finding that the taxes of 1894 were invalid, it seems to us to involve a judicial conclusion by the trial court respecting either the irregularity or illegality of the organization, or the irregularity or illegality of the levy, which being found in regard to the year 1894, ought to have been found with reference to the taxes of 1895, 1896 and 1897. It will be incumbent on the parties when they try the case again to request findings of fact which will make a clear-cut case for ultimate decision. As it now stands the taxes are apparently illegal and the treasurer should be restrained by injunction from enforcing their collection.

There is another proposition respecting which we deem it wise and rightful to express an opinion. According to the evidence of the treasurer, he was proceeding to sell the whole

of the Baca grant for the school taxes thus levied on a small section of it; it was also his purpose to so proceed with reference to the taxes of 1895, 1896 and 1897. This he had no legal right to do. When taxes are levied on property in school districts, the property of that district alone is subject to sale, and though the party may own 50,000 other acres elsewhere located, the treasurer may not proceed in the enforcement of the taxes levied upon a particular 20,000 acres more or less, to sell 60,000 or 70,000 other acres outside of the district which may belong to the same owner. The treasurer must sell the property on which the taxes have been levied to collect the taxes levied on it, and cannot sell other property under his tax warrant to enforce the collection of those specific taxes on this specific property. There is another matter which ought to be investigated, and with reference to which, probably, the court may be compelled to take action, and that is, it may be compelled to determine whether these taxes were levied on the personalty or on the realty. The schedules are insufficient in this particular, and since the record shows that all the personal property of that section of the grant was owned by George H. Adams, if the taxes were levied on it, this property must be seized and sold and not the realty, unless the taxes were levied on it. We are quite unable to determine from an inspection of the exhibits what the fact may be in this particular. It is a matter easily determinable from the records of the assessor and treasurer's office, and those records should be produced and thereon the court should make a finding respecting them.

We conclude from an inspection of this record the court erred in dissolving the injunction as to the taxes for the years 1895, 1896 and 1897. We refuse to order an injunction from this court restraining the collection of those taxes for the very evident reasons exhibited by the opinion. We shall send the case back for a further hearing leaving it to the presiding judge to make such restraining order as he may be advised and to make an investigation of the various questions which we have suggested, leaving it to him to

solve these difficulties on the testimony which may be produced and to make his findings in the light of this opinion. He can then either grant or refuse the perpetual injunction and make such decree as he may be advised, and if either party shall be dissatisfied with its conclusions the case can upon a fuller hearing be finally determined in this court.

For the reasons expressed the judgment of the lower court dissolving the injunction will be reversed and the case remanded for further proceedings in conformity with this opinion.

*Reversed.*